## Thayer v. Hedges and Another.

CONSTITUTIONAL LAW—LEGAL TENDER.—Congress has substantial power to borrow money.

To do so it may resort to any measure which is appropriate, which plainly conduces to that end, and which is not prohibited, and is not inconsistent with the letter or spirit of the constitution.

The issue of legal-tender treasury notes fulfills all these conditions, and is therefore authorized by the constitution as a means to effect loans. *Thayer* v. *Hedges*, 22 Ind. 282, overruled.

CONTRACT PAYABLE IN GOLD—MEASURE OF DAMAGES.—In a suit upon an instrument for the payment of $500 in gold, the measure of damages is not the value of $500 of gold coin, but $500 with interest from the date of default.

APPEAL from the *Boone* Circuit Court.

FRAZER, J.—On the 31st of *October* last this court rendered a judgment affirming the judgment of the court below in this cause: The opinion, which was pronounced by *Perkins*, J., on that occasion, is reported in 22 Ind. 283, *et seq.* On the 26th of *November* following, an order was entered here setting aside the judgment of affirmance, and

continuing, under advisement, the question as to the judgment to be entered. Since then other judges have come upon the bench of this court, whose duty it is to act upon the case. Finding, upon careful consideration, that we are unanimous in holding an opinion entirely different from that heretofore given by the learned judge who was one of our predecessors, it seems to be our duty to deal with the case as if it had never been considered, and to pronounce such an opinion and enter such a judgment as shall, in our view, be in accordance with the law of the case.

The plaintiff sued, framing his complaint as upon a promissory note, to recover upon an instrument dated *March* 26, 1862, for the payment, four months after its date, of "$500 *in gold.*" The answer alleged a tender in treasury notes, such as are made a legal tender by acts of Congress. To this a demurrer was overruled and exception taken, and upon that ruling arises the chief question before us. An authoritative settlement of this question can only be made by the Supreme Court of the *United States*, and that tribunal has not yet pronounced upon it. The highest courts of the states of *New York, California,* and *Iowa*, and also that of the *District of Columbia,* have been compelled to decide it, and in each case they have sustained the power of Congress. But their decisions have not been reported, and we are consequently deprived of the opportunity to examine the reasoning by which they reached the common result at which they all arrived. The question is one of immense importance; and, finding it thus in our path, where we can not avoid meet-it, we must attempt to solve it as best we may.

Does Congress possess the power to make these treasury notes a legal tender in the payment of debts?

To answer this question we must look to the constitution of the *United States.* It is not within our province, as a court, either to consider or discuss the wisdom or the policy of the measure; these are matters for the considera-

tion of statesmen and of the people, proper to be treated by the newspaper press and the political pamphleteer, and to be discussed in the halls of Congress and at the hustings. But such discussions are out of place and impertinent on the part of a court when considering a mere question of constitutional power. If the power is given by the constitution, then we must hold the act valid law, however unwise its exercise. If it was not given, and that is clear, then we must not fail to hold the act void, however well adapted we may deem it to promote the public interests.

The constitution expressly grants to Congress certain powers which it names; and among these is the authority "to borrow money on the credit of the *United States.*" (Art. 1, sec. 8.) It also expressly grants power "to make all laws which shall be necessary and proper for carrying into execution" all the powers named, etc. *Ibid.*

To avoid expanding this opinion to unreasonable limits, we do not allude to the power given to "raise and support armies," although we are unanimously of opinion that the authority sought may be clearly shown to be there, as a means of accomplishing the end. It may be "necessary and proper" in order to carry into effect more than one of the substantive and specific powers delegated by the constitution. It throws no doubt whatever upon the constitutionality of any measure which is used instrumentally, that different judges may find it to be incident to different powers conferred upon Congress by name; for it may be so, and each may be right. In the present instance, the inquiry will be confined to a single one of the functions of Congress.

In exercising its unquestionable authority to borrow money, Congress selected, as a means to accomplish that end, the issue and delivery to the lenders and government creditors of treasury notes, and provided that such notes should be a legal tender. If this was "necessary and proper" in order to borrow money, then, inasmuch as it

is nowhere prohibited, there can be little doubt that the act is within the limits of constitutional authority.

That the measure was well calculated to procure loans, that it was a most efficient and convenient means of accomplishing the end, which Congress had authority to accomplish, it is safe to say, has never been for a moment questioned, and never can be. It did readily effectuate that object. But it is argued that it was, nevertheless, not "necessary," in the sense of the constitution, and here arises the only point connected with the subject where there is, as I think, any room for difference of opinion. It presents a question of construction; but it seems to me that the principle which solves it has been so well settled, and so repeatedly and uniformly recognized by the Supreme Court of the *United States*, that it ought to be regarded as at rest forever. That principle is, that any means which is appropriate, which plainly conduces to the end authorized to be attained, which is not prohibited, and is not inconsistent with the letter and spirit of the instrument, is constitutional. To give the word "necessary" a signification which would deny to Congress the choice of means, and confine it to such only as are *indispensably* necessary, would be absurd in the extreme; for there are many substantive powers expressly granted by name which would thus be utterly denied; and our admirable constitution, which was called into being for the very purpose of creating a government with powers ample enough to enable it to perform every essential national function, would contain an express grant of all those powers, and yet a denial of the faculty of executing them. To illustrate, there is the authority to borrow money; but the issue of legal-tender notes, for that purpose, is not the *only* means by which money may be borrowed; therefore it is not *absolutely* necessary; and if for that reason it is unconstitutional, then the same argument would deny the power to resort to any and every other measure to obtain a loan; for it could be truly said of each that some other method could be success-

fully resorted to.  Like illustrations, as to the power to levy taxes, to regulate commerce, to coin money, to raise armies, to maintain a navy, and indeed as to almost every authority conferred on Congress, might be given, showing that such a rigid construction as has been indicated would, if admitted, demonstrate the constitution to be the grandest work of human folly that the world has ever seen.

And there can be found between that rule of construction which would result in all this absurdity, and the other rule which we have announced, which gives Congress the free choice of means adapted to the end, and limited only by the letter and spirit of the instrument, no intermediate ground at all tenable.

Upon the construction to be placed upon this clause of the constitution, as has been already intimated, there is no room left for doubt, if we are to pay any respect whatever to the decisions of the Supreme Court of the *United States.* We are bound, too, by the decisions of that court, upon this question; they are authority which we must yield to, and which we have no right to disregard.  To do so would be to set at defiance the law, which it is our duty to take as our guide.  (1 Wheat. 304; 6 Wheat. 264; 3 Marsh. 423; 8 Pick. 196; 6 Conn. 493; 6 Binn. 272; 5 Mon. 294.)

In 1805, the question first arose, and the principle of construction was announced.  The validity of an act of Congress, giving the *United States* a priority over other creditors, was assailed.  Chief-Justice *Marshall* delivered the unanimous opinion of the court, holding that, "in construing this clause, it would be incorrect, and would lead to endless difficulties, if the opinion should be maintained that no law was authorized which was not *indispensably* necessary to give effect to a specified power.  Where various systems might be adopted for that purpose, it might be said, with respect to each, that it was not necessary, because the end might be attained by other means.  Congress must possess the choice of means, and must be empowered to use any means which are, in fact, conducive to the exercise

of a power granted by the constitution." *United States* v. *Fisher*, 2 Cranch, 358.

In 1816, that court again, through Mr. Justice *Story,* reiterated the same rule of interpretation, deeming it so plainly correct that it ought never to have been questioned. *Martin* v. *Hunter's Lessee,* 1 Wheat. 304.

Three years later, the same clause of the constitution came again before that court for construction, in the well-known case of *McCulloch* v. *The State of Maryland,* 4 Wheat. 316. The constitutionality of the *United States Bank* was in question, and the court had the aid of argument on both sides, which for exhaustive research and great ability has perhaps never been excelled. The court gave the case, and especially this clause of the constitution, a very thorough examination. The opinion of all the judges, delivered by the chief-justice, is to the same effect as in the former cases, and is summed up in the comprehensive terms which we have already chosen to adopt, in expressing the rule by which, in our judgment, the question of construction is to be determined. This case settled the rule of construction as a question of law, and we are not aware that its correctness has since been doubted by any court in America. It has, on the other hand, been several times reaffirmed by that court, and acted upon and applied by the judicial tribunals, both state and national, in many cases, both before and since. *Woodson* v. *Randolph,* 1 Virg. Cas. 128; *Magill* v. *Parsons,* 4 Conn. 317; *Commonwealth* v. *Morrison,* 2 Marsh. 75; *Osborn* v. *United States Bank,* 9 Wheat. 738; *Wayman* v. *Southard,* 10 Wheat. 1.

Indeed, we find a palpable recognition of this principle in the opinion of Judge *Perkins,* heretofore pronounced in the present case, where he announces that Congress only can suspend the writ of *habeas corpus.* The argument is, that Congress has power " to establish tribunals inferior to the Supreme Court;" that this is a power to grant or withhold from such courts the right to issue or suspend

judicial writs, of which that of *habeas corpus* is one. And yet, if Congress must use such instrumentalities (and none other) as are absolutely necessary to *establish* these courts the proposition of the learned judge would be difficult to maintain; for it is impossible to say that the courts could not exist without being clothed with the authority to issue or withhold that writ.

It is safe also to observe that every Congress which has assembled since the adoption of the constitution, has recognized this principle by acting upon it in legislation, and that it has received, in the same manner, the repeated sanction of every executive. It constitutes the warrant which justifies nearly the whole body of our national statutes, and without which the government, under the constitution, would long since have proved as complete a failure as it was under the articles of confederation.

A rule of construction, supported, as we have seen, by every consideration which comports with sound reason, which has been declared by the tribunal having power to declare it with the voice of authority, and sanctioned by the unbroken practice of the executive and legislative departments, throughout the whole period, since the constitution was adopted, must, we think, be deemed settled.

It remains, then, only to consider whether there is any thing in the spirit of the constitution inconsistent with the issuing of legal-tender notes, as a means for borrowing money.

The only reasons which have been suggested, so far as we are aware, maintaining the view that there is found in the spirit of the constitution an implied prohibition of the measure under consideration, are: *first*, that the constitution secures an exclusive metallic currency; and, *secondly*, that the measure *forces* loans from the people without their consent.

Concerning the first of these suggestions, it may be observed that, as a legal proposition, it can not, in view of authority, be assented to. 10 Wheat. 333; 9 Pick. 539;

7 Johns. 476. When the constitution was adopted, the community were suffering immensely on account of paper issues, and hence it is fair to assume that, if it had been intended to prevent these in the future, apt words for that purpose would have been inserted, as was done relative to other things, and especially when it is borne in mind, that it was publicly claimed, in debate in the convention, that the power to borrow carried with it the incidental power to issue paper money, and that on that ground some deputies voted to strike it out, deeming it vicious as a substantive power, and only proper to be resorted to as a means to other ends. *Madison's Debates,* 434–435. The whole structure of the instrument shows that what was intended to be prohibited, was intended to be so plainly done, either in express terms or by necessary inference, that there could be little room for misunderstanding. The states are expressly prohibited from issuing bills of credit, and from making paper a legal tender. But Congress is not; but is, on the other hand, clothed with the power to borrow, and with the further power to adopt whatever measures for obtaining loans may be conducive to that end; and this is such a measure as was fresh in the memory of every one of the statesmen who assisted to frame the instrument. As a substantive power, to be used for its own sake, it is well known that it was withheld by design. The bitter experience of those times had created the universal belief that such a currency was not desirable on its own account, but it was not forgotten that but for it the War of Independence had been, in all probability, a failure. The exigencies of the future could not be foreseen, nor specifically provided for; great emergencies might possibly arise, when money could be borrowed by no other means, and when the liberties of the people might be lost, unless Congress was left at liberty to resort to it. It would have been unwise therefore, and unnatural, to have denied it as a means of obtaining loans.

The second suggestion, and which denounces the measure as one for obtaining money by force, may be more briefly disposed of. It has no pertinence whatever to the question in hand, for the reason that neither in letter nor spirit does the law provide for the employment of force to compel any one to purchase from the government the paper provided for, or to coerce any one to loan his means to the government. But it is said that it is done indirectly thus: The government desires to borrow $500 of *Thayer*, which he refuses to lend. It then calls on the defendants, and says, You owe *Thayer* $500; pay it to us, and we will give you $500 of legal-tender paper, which we will compel him to take in payment of your indebtedness to him. But are these facts apparent in this record? Did they occur in this case? Does the statement represent what the act of Congress authorizes any officer to do? When such a case comes before us, we will consider it.

But we are not prepared to admit the legal proposition which this objection assumes to be true. The argument has no force, unless it is established that private property can not, under the constitution, be taken by Congress for public use, against the owner's will. That it may be, with just compensation, which need not be first made, is, we suppose, too clear to need argument in its support. The constitution itself is plain enough upon the subject, and all publicists agree that it is a power inherent in the very nature of sovereignty. We may all hope, however, that it will be long before an occasion will arrive calling for a resort to it to obtain money.

It may be stated, in brief, by way of recapitulation, that the considerations which lead this court to the conclusion that the legal-tender law is valid are:

1. Congress has the substantive power to borrow money.

2. To do so, it may resort to any measure which is appropriate, which plainly conduces to that end, and which is not prohibited, and is not inconsistent with the letter or spirit of the constitution.

3. The issue of legal-tender treasury notes fulfills all these conditions, and is therefore authorized by the constitution as a means to effect loans.

The judgment below was for $513; the answer alleged a tender of $512.40, on or about the 4th of *January*, 1863, which it avers was the full amount due. The evidence, which is in the record, shows the tender to have been $513, and made on the 1st of *January*. There is no error here. The answer must, we think, be taken to allege a tender of the whole amount due, (though computing interest till *January* 4th, it is not enough,) the date alleged not being material, nor requiring strict proof, and therefore no demurrer could be maintained on the ground that the sum alleged to be tendered was too small. The variance between the allegation and the proof was amendable below on the trial, and must be disregarded here. 2 G. & H. 114, 115, 278.

Another question before us is this: was the plaintiff below entitled to recover the value of $500 of gold coin? We think not. The contract was not for $500 in gold *coin*, but "in gold." Gold in ingots, or dust from the mines, would have satisfied the contract, in our opinion; and on failure to deliver it, the measure of damages, under this contract, is $500, with interest from the date of default.

The judgment is affirmed, with costs.

*A. J. Boone*, for appellant.