The Lafayette, Muncie, and Bloomington R. R. Co. and Another *v.* Geiger.

the demurrer to the first and second paragraphs of the reply.

*H. I. Sherk* and *J. Mitchell,* for appellants.

*J. M. Brown* and *J. M. Wilson,* for appellee.

———————

## THE LAFAYETTE, MUNCIE, AND BLOOMINGTON RAIL ROAD COMPANY and Another *v.* GEIGER.

CONSTITUTIONAL LAW.—*Legislative Power.*—When the constitution of a state vests in the General Assembly all legislative power, as does ours (article 5, section 1), it is to be construed as a general grant of power, and as authorizing such legislature to pass any law within the ordinary functions of legislation, if not delegated to the federal government or prohibited by the state constitution.

SAME.—*Construction.*—*Constitutions and Statutes.*—Constitutions are to receive a strict construction, and acts of the legislature are to be liberally construed.

SAME.—"*Incorporated Company.*"—The words "incorporated company" in section 6 of article 10 of the constitution of this State, refer to those associations which are created for public benefit, and to which the government delegates a portion of its sovereign power, to be exercised for public utility,—such as turnpike, bridge, canal, and railroad companies.

SAME.—*Subscription for Railroad Stock by County.*—By the general grant of legislative power, the General Assembly of this State is empowered to authorize counties to subscribe for stock in railroad companies, and section 6 of article 10 of the constitution recognizes this power, and so limits it as to prevent such subscription unless the stock be paid for in money at the time of the subscription. A county cannot subscribe for such stock without appropriate affirmative legislation authorizing it.

SAME.—*Act of* 1869.—The authority granted by the Act of May 12th, 1869 (Acts 1869, p. 92), to counties to subscribe for stock in railroad companies, to be paid for at the time of the subscription, is a legitimate exercise of the power conferred on the legislature by section 1 of article 5 and section 6 of article 10 of the constitution; and the means provided in said act to raise the money with which to pay for said stock are appropriate, plainly conducive to the end proposed, and not prohibited by the constitution or inconsistent with the letter or spirit thereof.

SAME.—"*Taking Effect.*"—The fact that a vote of the people is necessary to carry the provisions of said act of 1869 into execution, does not render the

taking effect of the act dependent upon any authority other than the legislative power of the General Assembly, and therefore does not render the act in conflict with section 25 of article 1 of the constitution.

SAME.—*General and Local Laws.—County Commissioners.*—Said act is not in conflict with the constitutional restriction upon the enactment of local or special laws; and it is in accord with the provision of the constitution authorizing the legislature to confer upon county boards powers of a local administrative character.

SAME.—*Rate of Assessment and Taxation.*—Said act is not in conflict with the constitutional requirement that "the General Assembly shall provide by law for a uniform and equal rate of assessment and taxation," the rate in each county in which an appropriation is made under said act being uniform and equal throughout such county.

ELECTION.—*Change of Voting Places.—Inspector's Return.—Notice of Election.*—An election under said act, resulting in favor of the making of an appropriation by a county in aid of the construction of a certain railroad, there being no fraud, no legal voter being prevented from voting, and no illegal voter being permitted to vote, it was *held*, was not rendered illegal by the facts that the county commissioners changed the places of voting, in one of the townships, two days before such election, of which change no notice was given to the voters; that the inspectors in two of the townships made no return of the votes taken therein, where, if the whole number of votes in said townships had been cast against the appropriation, there would still have been a clear majority of all the votes cast in the county in favor of the appropriation; and that the question submitted to the voters of the county was for or against a subscription of stock in said railroad by said county, a resolution adopted by the commissioners when they ordered a vote to be taken being published in the election notice, to the effect that if the vote of the county should be in favor of an appropriation, they would subscribe for stock in said railroad company, for and on behalf of said county, and the question of *donating* money to aid in the construction of said railroad not being submitted in said notice.

APPEAL from the Tippecanoe Common Pleas.

BUSKIRK, J.—This case presents, for our consideration and decision, the constitutionality and validity of an act entitled "an act to authorize aid to the construction of railroads by counties and townships taking stock in, and making donations to, railroad companies" (approved May 12th, 1869), and the regularity and legality of the proceedings had, under such act, by the Board of Commissioners of Tippecanoe County.

The record shows the following facts:

Geiger's complaint against the Lafayette, Muncie, and

Bloomington Railroad Company and Andrew J. Castater, as Auditor of Tippecanoe county, states that he, Geiger, is the owner of real and personal property in said county, subject to taxation to the amount of ten thousand dollars and over; that on the 20th day of July, 1869, at a special session of the board of commissioners of said county, a petition, signed by over one hundred freeholders, was presented and filed with the board, in these words:

"To the Honorable, the Board of Commissioners of the County of Tippecanoe, in the State of Indiana: The undersigned, freeholders of said county, respectfully petition your honorable board to make an appropriation of money to aid the Lafayette, Muncie, and Bloomington Railroad Company in the construction of its railroad through said county, by taking stock in, or donating money to, said company, to the amount of three hundred and seventy-three thousand dollars.

" Dated, Lafayette, Indiana, July 15th, 1869."

It is then averred that the commissioners, acting under the law of May 12th, 1869, entitled "an act to authorize aid to the construction of railroads by counties and townships taking stock in, and making donations to, railroad companies," upon the filing of said petition, made the following order, to wit:

"Said board, after taking said petition under advisement, and after being fully advised, do order the polls of the several and respective voting places and precints be opened upon Saturday, the 28th day of August, 1869, and the votes of the legal voters of said county be taken for or against the appropriating of the money by the said county, for the purpose of aiding in the construction of the said Lafayette, Muncie, and Bloomington Railroad, as prayed for in said petition, by taking stock in said company, and that the auditor give due and legal notice to the qualified voters of said county of the opening of the polls pursuant to this order.

"And it is further ordered and declared that it is the opinion and judgment of said board that the appropriation asked for by said petition, to aid in the construction of said railroad,

should be made by taking stock in said railroad company, and not by donation, and that when said assessment is made, should the same be voted for on said 28th day of August, 1869, then, after the same is made and paid in, at the proper time, said board will aid in the construction of said railroad by taking stock therein."

The complaint then avers that the auditor, in compliance with this order, published in the Lafayette Daily Courier and in the Lafayette Weekly Courier, newspapers of said county, a notice on said 20th day of July, 1869, and daily thereafter till the 25th day of August, in these words: "To the qualified voters of Tippecanoe county, Indiana.

"Pursuant to an order of the board of commissioners of said county, notice is hereby given that the several voting places and precincts in said county will be open on Saturday, the 28th day of August, 1869, for the purpose of taking the votes of the legal voters of said county for or against the appropriation of three hundred and seventy-three thousand dollars, to be taken as stock in the Lafayette, Muncie, and Bloomington Railroad Company, to aid said railroad company in the construction of a railroad through said county.

"A. J. CASTATER,

"Auditor of Tippecanoe county."

In compliance with the law, the sheriff of said county posted handbills in three public places in each of the townships of said county, the last being posted on the 31st of July, 1869, which were copies of the notices published in the Courier by the auditor and above set out.

There was no other notice given to the voters of the county except that published in the Courier and by handbills posted by the sheriff.

The complaint avers, that on the 11th day of December, 1868, the board of commissioners made and entered upon their record an order in relation to districting the several townships of said county for voting purposes and fixing places for voting, as follows:

"They order that the township of Fairfield be districted

as follows, viz.: All that portion of said township lying north of the half section line running east and west through the center of sections 20, 21, 22, 23, and 24 in said township, shall constitute registering and voting district number two, and the board designate a voting precinct in said district *at or near* the corner of Sixth and Salem streets, in the city of Lafayette, in said township. And the board further order that all that portion of said township lying south of said half section line (Union street) and east of the section line running north and south between sections number 20, 29, and 32 on the west and sections 21, 28, and 33 on the east of said township upon which section line Ninth street in said city is located, shall constitute registering and voting district number three, and the board designate a place of voting for said district *at or near* the corner of Main and Ninth streets in said city. And the board further order that the balance of said township not embraced in said districts shall constitute registering and voting district number one, with a voting precinct at the recorder's office in said district." The board then appointed a board of registry and an inspector.

It is averred that this order continued in force till August 26th, 1869, when the board of commissioners, at a special meeting, set aside the same and passed the following:

"Ordered, by the board, that the order passed by this board on the 11th day of December, 1868, and recorded * * in relation to districting the several townships for voting purposes be and the same and every part thereof is hereby vacated, repealed, and set aside; and the board further order that there be established four election precincts or voting places in Fairfield township, to be numbered one, two, three, and four, for holding elections, which voting places shall be as follows: Precinct, or voting place, number one, at the county recorder's office, in the city of Lafayette; precinct, or voting place, number two, at the county auditor's office, in said city; precinct, or voting place, number three, at the west wing of the office of the clerk of the circuit court, in said city; precinct, or voting place, number four, at the east wing

of the office of the clerk of the circuit court, in said city; and the board appoint John S. Williams inspector of said precinct, or voting place, number two, Charles Hasty inspector of said precinct, or voting place, number three, and Judson A. Cleveland inspector of said precinct, or voting place, number four."

The complaint alleges, that there was no notice given of this repealing order changing the places of voting in Fairfield township; that on the 28th day of August, 1869, the polls were opened pursuant to the notice given, and "a vote of a portion of the voters of said county, *being all the legal voters who offered to vote* at the voting places where the polls were opened, was taken upon the question of said railroad appropriation, which vote in the township of Fairfield, in said county, was taken at the following named places, and not elsewhere, in the city of Lafayette," to wit: at the places named in the repealing order of August 26th above copied, in the recorder's, auditor's, and clerk's offices. It is charged that more than half of the votes cast upon the question of the appropriation were cast in Fairfield township, at said offices, which were in buildings not over forty yards apart.

The complaint proceeds to allege that on the Thursday next succeeding the day of the voting, all those composing the board of canvassers under said act, "except the inspectors of two voting places, to wit, one in Wabash and one in Washington township, in said county, at which places polls were opened and votes were cast, to whom the judges' certificates, poll-books and tally sheets of said precincts had been delivered, met at the proper time and place and canvassed the vote of said county, except in this, that the certificates, poll-books and tally sheets of the two voting places above mentioned were not present, nor were the inspectors present who had the same in charge; and on said day, at said time and place, those of said board present as aforesaid prepared and signed a statement of the number of votes cast on said day for and against said appropriation, except as to the two precincts last mentioned."

The certificate of the board of canvassers shows their meeting and canvassing of the votes and their examination and comparison of the returns, &c., and they certify that the whole number of votes cast was 5,657 :

| | | | | | |
|---|---|---|---|---|---:|
| For the appropriation, | - | - | - | - | 3,253 |
| Against the same, | - | - | - | - | 2,404 |
| Thus showing a majority in favor of - | | - | - | - | 849 |

This certificate was signed by seventeen out of nineteen inspectors, and attested by the auditor of the county as chairman.

The complaint admits "that the vote of said two omitted precints, if the same had been counted, would still have left a majority of the votes cast in said county, of between five and six hundred, in favor of the railroad appropriation."

At the regular June session of the board of commissioners for 1870, the complaint avers, two orders were made, one on the 8th of June in these words:

"Whereas a petition was presented to this board at a special session duly convened on the 20th day of July, 1869, signed by William S. Lingle and sundry others, making in all over one hundred freeholders of Tippecanoe county, Indiana, asking said board to make an appropriation of three hundred and seventy-three thousand dollars to aid the Lafayette, Muncie, and Bloomington Railroad Company in the construction of its railroad through said county, which petition was duly entered of record, and this board then ordered the several polls at the several voting places in said county to be opened on the 28th day of August, 1869, and the votes of the legal voters of said county to be taken upon the subject of said appropriation of money to aid said company in the construction of said railroad; and whereas it appears from the official certificates of the auditor and sheriff of said county that notice of the opening of said polls on said 28th day of August, 1869, for the purpose aforesaid, was duly published and given as required by law, and it further appears from the written statement of the board of canvassers of said county, that the said polls were opened pursuant to

said order of this board and of notice so given as aforesaid, at the several voting places in said county, on the said 28th day of August, 1869, and the votes of the legal voters of said county taken, and that a majority of the votes cast on said day, pursuant to said order and notice upon said subject, was in favor of said railroad appropriation, all of which appears on the records of this board as required by law :

" Now, therefore, in pursuance of the statute in such case made and provided, the Board of Commissioners of the County of Tippecanoe hereby grant the prayer of said petitioners contained in the petition so presented on the 20th day of July, 1869; and because the whole amount named in said petition exceeds one per centum upon the amount of the taxable property on the tax duplicate of said county for the year 1870, the board now hereby levy a tax of one half the amount of said appropriation so asked for as aforesaid, to wit, the sum of one hundred and eighty-six thousand five hundred dollars, upon the real and personal property in said county of Tippecanoe, to be collected *pro rata* upon the same; and the auditor of said county is hereby directed to assess and apportion the same against and upon the tax duplicate as required by law."

The other order was made on the 14th of June, in these words :

" Ordered by the board, that there be levied for county purposes for the year 1870, twenty cents on each one hundred dollars of valuation of taxable property, and one dollar on each poll, to be assessed, levied, and collected according to law, and a special tax of ninety cents on each one hundred dollars valuation of taxable property, to aid in the construction of the Lafayette, Muncie, and Bloomington Railroad through Tippecanoe county, said tax to be used in taking stock in said railroad company in the name of said county when said tax is collected."

The complaint avers that the railroad company, defendant, procured the petition of the freeholders to be filed, and the

The Lafayette, Muncie, and Bloomington R. R. Co. and Another *v.* Geiger.

passage of all the orders of the commissioners, and that said company had filed petitions with the board for the purpose of having aid afforded to build its road by having stock taken, &c.

The complaint alleges, that the defendant Castater, as auditor of the county, was about to proceed, in obedience to the above quoted orders of the commissioners, to apportion the special tax to be levied for the railroad appropriation upon the property in said county, and would do it unless restrained; that he would apportion and impose a part of the same, to wit, seventy-five dollars, upon Geiger's property, and put it on the tax duplicate for the purpose of collecting the same through the treasurer of the county; that said tax would, if put on the duplicate, be a cloud and incumbrance upon his property, &c.

The complaint alleges, that said tax is wrongful and oppressive, and ought not to be collected, for the following reasons:

1. That said act is unconstitutional and void.

2. That the proceedings of the commissioners in ordering the vote and levying the tax were unauthorized and void.

3. That the petition of the freeholders and the proceedings of the commissioners in reference thereto and of those acting under them are defective and irregular, in this, to wit:

(*a*) Because the prayer of the petition was in the alternative (i. e. for a donation or for taking stock), which it was impossible to grant in the terms asked.

(*b*) Because if the petition was correct, the proposition should have been submitted to the voters in the alternative, so as to leave the commissioners free afterwards to determine the mode of appropriation.

(*c*) Because the inspectors of two voting precincts were not present and did not participate in the proceedings of the board of canvassers, nor were the votes cast at those precincts canvassed by the board.

(*d*) Because the simple question submitted to the voters

was whether the board should take stock in the railroad company.

(*e*) Because the commissioners, instead of taking the petition under advisement, determined, prior to the taking of the vote, that they would take stock in the company.

(*f*) Because, instead of taking the petition under advisement, the commissioners determined to take stock, and then merely submitted to the voters the question of whether they would or would not ratify their action.

(*g*) Because the notices required by statute were not given, but that the notices merely submitted the question of taking stock.

(*h*) Because of the changing of the voting places in Fairfield township, no valid notices were given of the time and places at which the polls would be opened in the county (and especially in that township) for the reception of votes upon the question of the railroad appropriation.

(*i*) Because the vote of Fairfield township was cast at the places designated by the commissioners in their order of August 26th, 1869, of which no notice was given, instead of at the usual places theretofore established.

Prayer for an injunction restraining the auditor from assessing said railroad tax, or any part of it, upon the tax duplicate, against the appellee's property, &c.

A general demurrer to the complaint was filed by the defendants, which was overruled, and exception was taken.

The defendants refusing to answer further, the court entered a perpetual injunction against the levying or collecting of the tax, in accordance with the prayer of the complaint, to which the defendants excepted.

Two errors only are assigned: first, that the court erred in overruling the demurrer to the complaint; second, that the court erred in granting the injunction.

The first section of the act under consideration reads as follows:

" SECTION 1. *Be it enacted by the General Assembly of the State of Indiana,* That whenever a petition shall be presented

to the board of commissioners of any county in this State, at any regular or special session thereof, signed by one hundred or more freeholders of said county, asking said board to make an appropriation of money to aid a railroad company, named in such petition, then duly organized under the laws of this State, in the construction of a railroad in or through such county, or whenever such a petition shall be presented to such board of commissioners as aforesaid, signed by twenty-five freeholders of any township of such county, asking such township to make an appropriation of money to aid a railroad company named in such petition, and then duly organized as aforesaid, in constructing a railroad in or through such township, by taking stock in, or donating money to, such company, to an amount specified in such petition, not exceeding, however, two per centum upon the amount of the taxable property of such county or township, as the case may be, on the tax duplicate of the county, delivered to the treasurer of the county for the preceding year, it shall be the duty of the board of commissioners, after being satisfied that such petition has been properly signed by the requisite number of freeholders of such county or township, as aforesaid, to cause the same to be entered at full length upon their records."

Section 12 of said act reads thus: "If a· majority of the votes cast shall be in favor of such railroad appropriation, the board of county commissioners, at their ensuing regular June session, shall grant the prayer of said petition, and shall levy a special tax of at least one-half the amount specified in said petition, but not exceeding one per centum upon the real and personal property in the county or township, as the case may be, liable to taxation for state and county purposes, which tax shall be collected in all respects as other taxes are collected for state and county purposes; and if· the sum so levied shall not be equal to the amount specified in said petition, then the residue thereof shall be levied by said board of county commissioners at the June session of the following year."

Before we consider the question of whether the act under consideration is in conflict with the constitution, it is important for us to ascertain the rules of interpretation and construction by which we are to be guided and controlled. This can be best done by a brief reference to our system of government. Section 1 of article 5 of the constitution declares, that "the legislative authority of the State shall be vested in the General Assembly."

The Supreme Court of Iowa, in a recent decision, (*Stewart* v. *Board of Supervisors of Polk County*, 30 Iowa, 9) in commenting upon a provision similar to the one above quoted, say: "The people, then, have vested *the* legislative authority *inherent in them* in the General Assembly. The people were the original possessors of *all* the legislative authority in the state. By this section they vest it *all* in the General Assembly. Subsequently, in the same instrument, they withdraw some portions of this authority, and impose certain restrictions upon the exercise of the authority granted. It follows, therefore, as a logical sequence, that, within these limitations and restrictions, the legislative power of the General Assembly is supreme; that it is bounded only by the limitations written in the constitution. WRIGHT, J., in *Morrison* v. *Springer*, 15 Iowa, 304, says, 'The legislature clearly has the power to legislate on all rightful subjects of legislation, unless expressly prohibited from so doing, or where the prohibition is implied from some express provision. *This theory must never be lost sight of by the courts in examining the powers of the legislature. It is elementary, cardinal,* and frequently possesses controlling weight in determining the constitutional validity of their enactments. The General Assembly possesses *all legislative authority not delegated to the General Government, or prohibited by the constitution.*'"

The third article of our constitution provides, that "the powers of the government are divided into three separate departments: the legislative, the executive, including the administrative, and the judicial; and no person, charged with official duties under one of these departments, shall

exercise any of the functions of another, except as in this constitution expressly provided."

The same division of powers exists in the federal constitution, and in most, if not all, of the state constititutions, and is essential to the maintenance of a republican form of government. These departments of government are equal, co-ordinate, and independent. The duties imposed on each are separable and distinct, and it is expressly provided, that "no person, charged with official duties under one of these departments, shall exercise any of the functions of another." The persons charged with the execution of these powers are alike elected by, and responsible to, the people, in whom resides the sovereignty of the state. This division of power prevents the concentration of power in the hands of one person or one class of persons.

Upon the legislative department is conferred the power of making laws; upon the judicial department is imposed the duty of construing and interpreting the constitution and laws, and of making decrees determining private controversies; and upon the executive department is imposed the duty of executing the laws as made by the legislative department and construed by the judicial department. There is a wide and marked difference between the legislative power possessed by Congress and the legislature of a state, and in the rules and canons of construction in determining whether an act of Congress or of a state legislature is in conflict with the constitution. The federal government is one of limited and delegated powers, and Congress can exercise no power unless it has been expressly delegated, or shall be necessary and proper for carrying into execution the enumerated powers; and when the power of Congress to enact a law is called in question, it must be shown that the power to enact the law in question has been conferred in the manner above stated. MARSHALL, C. J., in speaking for the Supreme Court of the United States, in the case of *M'Culloch* v. *State of Maryland*, 4 Wheat. 316, says, " This government is acknowledged by all to be one of enumerated powers. The principle, that

it can exercise only the powers granted to it, would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge.   That principle is now universally admitted."

The true line of distinction between the powers of the federal and state governments was drawn with great clearness and force by WASHINGTON, J., in the case of *Golden* v. *Prince*, 3 Wash. C. C. 313.   This great and learned judge said, " The powers bestowed by the constitution upon the government of the United States were limited in their extent, and were not intended, nor can they be construed to interfere with other powers, before vested in the state government; which were, of course, reserved to those governments impliedly, as well as by an express provision of the constitution.   The state governments, therefore, retained the right to make such laws as they might think proper, within the ordinary functions of legislation, if not inconsistent with the powers vested exclusively in the government of the United States, and not forbidden by some article of the constitution of the United States, or of the state; and such laws were obligatory upon all the citizens of that state, as well as others who might claim rights or redress for injuries, under these laws, or in the courts of that state."

When the constitution of a state vests in the General Assembly all legislative power, it is to be construed as a general grant of power, and as authorizing such legislature to pass any law within the ordinary functions of legislation, if not delegated to the federal government or prohibited by the state constitution.

DEWEY, J., in speaking for the court, in the case of *Beauchamp* v. *The State*, 6 Blackf. 299, with his usual clearness and ability, draws the line of distinction between the powers of the federal and state governments.   He says, " This is not a grant of special, limited, and enumerated powers, implying a negative of all others, as is the case with the constitution of the United States.   The legislative authority of this State

is the right to *exercise supreme and sovereign power, subject to no restrictions except those imposed by our own constitution*, by the federal constitution, and by the laws and treaties made under it. This is the power under which the legislature passes all laws."

PERKINS, J., in *Doe* v. *Douglass*, 8 Blackf. 10, says, "If, then, this act is unconstitutional, it is because it infringes some restrictions upon the legislative power of the state, for that power is supreme except wherein restrictions have been imposed."

In the case of *Vanhorn's Lessee* v. *Dorrance*, 2 Dall. 304, the true nature of our government is stated with great clearness, force, and accuracy. The court say, "In England, the authority of parliament is transcendent and has no bounds. It has sovereign and uncontrollable authority; being the place where the absolute, despotic power, which must in all governments reside somewhere, is entrusted by the constitution of the kingdom. Its authority runs without limits, and rises above control, and the validity of an act of parliament cannot be drawn in question by the judicial department. But in America the case is different. Every state in the Union has its constitution reduced to writing. This constitution is the form of government, delineated by the people, in which the first principles of fundamental laws are established. It is certain and fixed, and is the supreme law of the land. It is paramount to the power of the legislature; the legislature is the creature of the constitution. The powers of the legislature are derived from the constitution, and their acts must be conformable to it. Every act of the legislature repugnant to the constitution is absolutely void."

The principles by which a court should be governed in holding a law to be unconstitutional are stated with very great clearness and completeness by MARSHALL, C. J., in the case of *Fletcher* v. *Peck*, 6 Cranch, 87, and by FRAZER, J., in the case of *Brown* v. *Buzan*, 24 Ind. 194.

MARSHALL, C. J., says, "The question, whether a law be void for its repugnancy to the constitution, is at all times, a

question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

FRAZER, J., says; "The constitution is paramount to any statute, and whenever the two are in conflict, the latter must be held void. But where it is not clear that such conflict exists, the court must not undertake to annul the statute. This rule is well settled, and is founded in unquestionable wisdom. The apprehension sometimes, though rarely, expressed, that this rule is vicious, and constantly tends toward the destruction of popular liberty by gradually destroying the constitutional limitations of legislative power, results from a failure to comprehend the character of our forms of government, and the fundamental basis upon which they rest. The legislature is peculiarly under the control of the popular will. It is liable to be changed, at short intervals, by elections. Its errors can, therefore, be quickly cured. The courts are more remote from the reach of the people. If we, by following our doubts, in the absence of clear convictions, shall abridge the just authority of the legislature, there is no remedy for six years. Thus, to whatever extent this court might err, in denying the rightful authority of the law-making department, we would chain that authority, for a long period, at our feet. It is better and safer, therefore, that the judiciary, if err it must, should not err in that direction. If either department of the government may slightly overstep the limits of its constitutional powers, it should be that one whose official life shall soonest end. It has the least motive to usurp power not given, and the people can

sooner relieve themselves of its mistakes. Herein is sufficient reason that the courts should never strike down a statute, unless its conflict with the constitution is clear. Then, too, the judiciary ought to accord to the legislature as much purity of purpose as it would claim for itself; as honest a desire to obey the constitution, and also a high capacity to judge of its meaning. Hence, its action is entitled to a respect which should beget caution in attempting to set it aside. This, with that corresponding caution of the legislature, in the exercise of doubtful powers, which the oath of office naturally excites in conscientious men, would render the judicial sentence of nullity upon legislative action as rare a thing as it ought to be, and secure the harmonious co-operation of the two departments and that independence of both which are essential to good government."

BLACKFORD, J., in the case of *The State* v. *Cooper*, 5 Blackf. 258, in speaking of the constitutionality of an act of 1831, says, " In questions of this kind, it is our duty to decide in favor of the validity of the statute, unless its unconstitutionality is so obvious as to admit of no doubt."

DEWEY, J., in the case of *Beauchamp* v. *The State*, 6 Blackf. 299, in speaking of the constitutionality of a law, says, " If it be unconstitutional, all such proceedings are void. The consequences are evident. Before we can consent to open a door to them, we must have the *fullest conviction that stern duty demands it at our hands.* We have not that conviction. We are not satisfied that the general authority of the legislature is so trammeled by any portion of the constitution, as to be incompetent to pass this beneficial law. We had this subject under consideration on a former occasion, and after much reflection, came to the same conclusion which we now express. If the views here advanced do not leave the constitutional question in regard to this law free from all difficulty, we feel well assured they involve it in too much doubt to authorize us to declare the statute a nullity."

In the case of *Maize* v. *The State*, 4 Ind. 342, STUART, J., speaking for the court, says: " Such questions are always

regarded by the courts as of serious importance. The judiciary look to the acts of the legislature with great respect, and reconcile and sustain them if possible. The general assembly is the immediate exponent of the popular will, expressly delegated to clothe that will with the forms of law. The presumption that such a body has sanctioned enactments in violation of the constitution, is not to be lightly indulged. That the act is imperfect or impolitic is not enough. These defects subsequent legislation can remove by amendment or repeal. To bring its validity within the control of the courts, it must be clearly subversive of the constitution."

BLACK, C. J., in *Sharpeless* v. *The Mayor of Philadelphia,* 21 Penn. St. 147, says, "There is another rule which must govern us in a case like this, namely, that we can declare an act of assembly void, only when it violates the constitution *clearly, palpably, plainly,* and in such a manner as to leave no doubt or hesitation in our minds."

We recognize as correct the doctrine so repeatedly enunciated by the highest courts and ablest lawyers, that constitutions are to receive a strict construction, and that acts of the legislature are to be liberally construed.

As we will be required in the decision of this case to place a construction upon, and give an interpretation to, several sections of our constitution, it is important and essential that we should ascertain the rules of *constitutional construction.* The Supreme Court of the United States have enunciated several rules of constitutional construction, among which the following are important:

1st. The framers of the constitution must be undertsood to have employed words in their natural sense, and to have intended what they said; and, in construing the extent of the powers which it creates, there is no other rule than to consider the language of the instrument which confers them in connection with the purposes for which they were conferred. The court should look to the nature and objects of the particular powers, duties, and rights in question, with all

the lights and aids of cotemporary history, and give to the words of each provision just such operation and force, consistent with their legitimate meaning, as will fairly secure and attain the end proposed. *Gibbons* v. *Ogden,* 9 Wheat. 1; *Prigg* v. *Pennsylvania,* 16 Pet. 539.

2d. The court should look to the history of the times, and examine the state of things existing when the constitution was framed and adopted, to ascertain the old law, the mischief, and the remedy. Thus, the language used in the federal constitution as to the power of pardoning must be construed by the exercise of that power in England prior to the revolution, and in the states prior to the adoption of the constitution. *Rhode Island* v. *Massachusetts,* 12 Pet. 657; *Ex parte Wells,* 18 How. U. S. 307.

3d. A cotemporary exposition of the constitution, practiced and acquiesced in for a period of years, fixes the construction; and the court will not shake or control it. *Stuart* v. *Laird,* 1 Cranch, 299; *M'Culloch* v. *Maryland,* 4 Wheat. 316; *Briscoe* v. *Bank of Kentucky,* 11 Pet. 257; *Prigg* v. *Pennsylvania,* 16 Pet. 539; *N. J. Steam Navigation Co.* v. *Merchants Bank,* 6 How. 344; *West River Bridge Co.* v. *Dix, id.* 507; *Cooley* v. *Wardens of the Port of Philadelphia,* 12 How. 299; *The Genesee Chief* v. *Fitzhugh, id.* 443.

4th. Where a statute admits of two interpretations, one of which brings it within, and the other presses it beyond, the constitutional authority of the legislative department, the judiciary will adopt the former construction; because a presumption ought never to be indulged that the legislature meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the court by language altogether unambiguous. *United States* v. *Coombs,* 12 Pet. 72.

Having laid down the rules by which we are to be governed in construing the constitution and the law in question, we proceed to consider the real questions involved in this case. The first and principal objection urged against the validity of the action of the board of commissioners is,

that the act of the legislature authorizing aid by counties and townships to the construction of railroads is unconstitutional and void, for the reason that the legislature does not possess the constitutional power to tax the people for such a purpose.    We approach the discussion of this grave and important question, deeply impressed with the weight of responsibility imposed upon us and the magnitude of the interests involved in our decision.    We have given the subject our best and most careful consideration.    We have been greatly aided in our labors by the very thorough and able briefs filed in this cause, and by the very accurate, comprehensive, and exhaustive oral argument submitted to us by the able and learned counsel engaged in the case.    The constitutional power of the state legislatures to impose a tax upon the people to aid in the construction of railroads, canals, and other works of improvement has been undergoing the most thorough and elaborate discussion in many of the states. The question has been passed upon by the courts of twenty-four states.    The most of these decisions have been based upon the general power of taxation possessed by the legislative department of the government.    In some of the states it was held that there was an express delegation of power in the constitution.    We propose to base our decision upon the provisions of our own constitution, and the adjudications of this court, with such aid as we can derive from decisions in other states in construing our constitution.    It has been earnestly insisted by the appellants that section six of article ten of our State constitution contains a grant of power; while the appellee has contended that that section was intended as a restriction and limitation upon the general grant of power.    The decision of this question will be decisive of the principal point involved in the case.    Section six of article ten reads as follows:

"Sec. 6.    *No county shall subscribe for stock in any incorporated company, unless the same be paid for at the time of such subscription;* nor shall any county loan its credit to any incorporated company, nor borrow money for the purpose

of taking stock in any such company; nor shall the General Assembly ever, on behalf of the State, assume the debts of any county, city, town, or township, nor of any corporation whatever."

The second rule laid down by the Supreme Court of the United States, in construing a constitution, reads thus:

"The court should look to the history of the times and examine the state of things existing when the constitution was framed and adopted, to ascertain the old law, the mischief, and the remedy."

In 1836, the State of Indiana engaged in a general system of internal improvements. The State issued her bonds for millions of dollars, which were sold in the market at a heavy discount. The money thus procured was squandered on various railroads and canals, without completing any of them. The State was unable to pay either the interest or principal of her bonded debt. The bonds of the State greatly depreciated in value, and her credit was utterly ruined in the money market. This wasteful, reckless, and extravagant expenditure of money continued until 1842, when the whole system broke down, and the completion of the works commenced was abandoned by the State. On the 28th day of January, 1842, the legislature passed an act, entitled "an act to provide for the continuance of the construction of all or any part of the public works of this State, by private companies, and for abolishing the board of internal improvements and the offices of fund commissioners and chief engineer." The sixty-first section of said act reads as follows:

"It shall be lawful for any county within this State to take stock in such association; and for this purpose, the several boards doing county business are hereby empowered to subscribe therefor, and to levy a tax as for county purposes, not exceeding one dollar on every hundred dollars of assessed property, to be applied to such object; and the county shall hold such stock as individual stock is held in such association."

Under this act many private companies were formed. A

large number of the counties took stock in such associations, and issued bonds instead of levying taxes, and became thereby largely indebted.

On the 14th of February, 1848, the legislature passed an act incorporating the Ohio and Mississippi Railroad Company, the twelfth section of which reads as follows :

"It shall be lawful for the county commissioners of any county in the State of Indiana through which said railroad passes, for and on behalf of such county, to authorize, by order on their records, so much of said stock to be taken in said railroad as they may deem proper at any time within five years after opening the books of subscription to said stock: provided, however, that it shall be and is hereby made the duty of said county commissioners in any county through which said railroad may pass, in the State of Indiana, to subscribe for stock for and on behalf of said county, if a majority of the qualified voters of said county, at any annual election within five years after said books are opened, shall vote for the same by placing on their tickets, subscription to railroad stock."

Under this act, the most of the counties through which the said railroad passed, in the State of Indiana, made subscriptions of stock in said company, and issued their bonds to secure the payment thereof. Charters were granted to several other companies with similar provisions. Under the State system the State had become bankrupt, and under the county system many of the counties had created heavy and onerous debts. In 1846 and 1847, the State effected a compromise with her bond holders, by surrendering to them the Wabash and Erie canal for one half the debts, and issuing new bonds for the other half. Such was the condition of our State when the constitutional convention assembled in 1850; and in placing a construction upon the provisions of our present constitution, we are required to take into consideration the provisions of the old constitution, existing laws, the mischiefs resulting therefrom, and the remedy proposed in the new constitution.

Section five of article ten was adopted to prevent the State from again engaging in a system of internal improvements on credit. That section reads as follows:

"Sec. 5. No law shall authorize any debt to be contracted, on behalf of the State, except in the following cases: to meet casual deficits in the revenue; to pay the interest on the State debt; to repel invasion, suppress insurrection, or, if hostilities be threatened, to provide for the public defense."

This section does not prohibit the State from building railroads or canals, but it does provide that no debt shall be contracted for that purpose. The legislature undoubtedly possesses the power, under the general grant of powers, to engage in the construction of works of public use, provided she has the money and pays for the work as it progresses. The only limitation or restriction on the power of the general assembly is, that no debt shall ever be contracted on behalf of the State for such object. Sections five and six of article ten engaged the earnest and serious attention of the convention. The discussion of. the matters embraced therein consumed six entire days, and was conducted with great earnestness and marked ability. The debates in the convention on the matters embraced in sections five and six show that nearly every speaker referred to the financial condition of the State, counties, cities, and the people, produced by the attempt to construct railroads and canals on credit; nearly every speaker expressed himself in favor of the construction of such works, but declared that the past experience had demonstrated that it was neither wise, safe, nor politic to permit either the State or counties to create any debt for such purpose. There was great diversity of sentiment in the convention. Some of the members advocated absolute prohibition; a few opposed any restriction; but the great majority were in favor of retaining the power, and desired to place such restrictions and limitations upon the exercise of the power as would prevent in the future the evils that resulted from the credit system. The result was the adoption of sections five and six, which, by plain implication, admit that by

the general grant of legislative power, the power was dele-
gated to the General Assembly, and these sections were in-
tended to restrict and limit the power conferred, in such a
manner as to prevent the creation of any debt by the State
or counties for such purpose.

Let us analyze section six, and see what it contains. It con-
tains four propositions; first, no county shall subscribe for
stock in any incorporated company, unless the same be paid
for at the time of such subscription; second, no county shall
loan its credit to any incorporated company; third, no county
shall borrow money for the purpose of taking stock in any
such company; fourth, that the General Assembly shall
never, on behalf of the State, assume the debts of any county,
city, town, or township, or of any corporation whatever.
These propositions are plainly stated, and seem to be easily
understood, except the clause prohibiting a county from loan-
ing its credit to any incorporated company. The meaning
of this clause is rendered plain by reference to the practice
that prevailed under the act of 1842. Quite a number of
the counties had guaranteed the payment of bonds issued by
the private associations that had been organized under the
act of 1842. The object of the inhibition in question was
to prohibit and render impossible this practice. These propo-
sitions are all stated negatively. They were intended as lim-
itations upon the general powers granted by section 1 of ar-
ticle 5, and necessarily assumed the negative form. Let us
transpose the first clause, and state it affimatively. Thus
transposed, it would read, "Any county may subscribe for
stock in any incorporated company, if such stock is paid for
at the time of such subscription." This is the plain and un-
doubted meaning of this clause. If the purpose had been
to absolutely prohibit a county from subscribing for stock,
the object would have been effectually accomplished by
omitting the condition. The section would then have read,
"No county shall subscribe for stock in any incorporated
company." Such language would have been plain and unam-
biguous, and there would have been no room for doubt. The

prohibition would have been absolute. It will not do to say that this clause was intended as a prohibition. It was a limitation upon an existing right. It is manifest that the framers of the constitution supposed that the power to subscribe for stock had been previously granted, for it would be absurd to suppose that they would either attempt to *prohibit* or *limit* a power that did not exist. If this clause is treated as a prohibition, it unavoidably results that the same construction must be placed on section five, which would deprive the General Assemby of the power to construct a railroad or canal, although she had the money to pay, and contracted no debt therefor. Nor would the evils of such a construction stop here. Section twenty-one of article one reads as follows: "No man's particular services shall be demanded without just compensation. No man's property shall be taken by law without just compensation; nor except in case of the state, without such compensation first assessed and tendered." If the construction contended for were applied to the sentence, that "no man's property shall be taken by law without just compensation," it would deprive the General Assembly of the power to grant the right of eminent domain to any incorporated company. If this sentence were transposed, and stated in an affirmative manner, it would read, "Any man's property may be taken by law, for a public use, provided just compensation is made therefor; and if such property is taken by any person other than the state, the compensation shall be assessed and tendered before it can be taken." The evident purpose was to recognize the existence of the right of eminent domain; and to impose a restriction upon the exercise of such right, so as to prevent a corporation from taking private property until just compensation had been assessed and tendered.

The sixth section provides, that "no county shall subscribe for stock in any *incorporated company,*" &c. This language is general. It does not define the character or purposes of the company. It, therefore, becomes necessary to ascertain, if possible, the character and purposes of the company in-

tended by the framers of the constitution. Mr. Justice MAR-TIN, in delivering the opinion of the Supreme Court of Michigan, in the case of *Swan* v. *Williams*, 2 Mich. 427, gives a very clear and comprehensive definition of the different classes of corporations. He says, " Most certain it is that as to all their rights, powers and responsibilities, *three* grand classes of corporations exist: first, political, or municipal corporations, such as counties, towns, cities and villages, which, from their nature, are subject to the unlimited control of the legislature; second, those associations which are created for *public benefit,* and to which the government delegates a portion of its sovereign power, to be exercised for public utility, such as turnpike, bridge, canal and railroad companies ; and, third, *strictly private corporations,* where the *private interest* of corporators is the *primary* object of the association, such as banking, insurance, manufacturing, and trading companies."

It is quite clear to us that the framers of the constitution, in using the phrase " incorporated company," referred to the second grand class of incorporations as above defined. This is manifest from several considerations. The power was being conferred upon counties, which are included in the first grand class. It certainly was not the intention to authorize counties to subscribe for stock in townships, cities, or towns. It is equally plain that it was not intended that counties should subscribe for stock in strictly private corporations, such as banking, insurance, manufacturing, or trading companies. It was broadly admitted in argument, and is well settled on principle, and by a long and unbroken line of decisions, that the power of taxation cannot be exercised for private purposes; it must be for a public use. The meaning and intention of the framers of the constitution are rendered quite plain and obvious, when we " look to the history of the times, and examine the state of things existing when the constitution was framed and adopted." The policy of the State had been to encourage counties to take stock in canal and railroad companies. Laws then in existence authorized such subscriptions. Besides, the debates in the convention

on the matters embraced in sections five and six leave no room for doubt as to the class of incorporated companies intended.

It was admitted, in argument, that a county might subscribe for stock in a railroad company, if the money was in the treasury to pay for it when the subscription was made, but it was contended that no power existed to adopt means to carry into execution the powers granted. It is the duty of the court to give such construction to the section under consideration as will execute the power granted. It is the duty of this court to execute, and not defeat, the will of the people, as expressed in the constitution. It is admitted that when the legislature has authorized it, counties may subscribe for stock in railroad companies, on the condition that the money is paid when the subscription is made. The counties are prohibited from loaning their credit or borrowing money to subscribe for such stock. The board of commissioners are prohibited by the law from collecting, by taxation, more money than is absolutely required for the current expenses of the county. If the commissioners obey the law, and act honestly and fairly with the people, there will never be any considerable surplus in the treasury. It will occasionally happen that there will be a deficit, and then again a small surplus. The great and wise men who framed our present constitution surely never intended to grant a power that could not be honestly and fairly executed. Surely, it was never intended that the boards of commissioners of the several counties should, under the guise of raising money for the ordinary expenditures of the counties, accumulate a surplus of money with which to subscribe for stock in incorporated companies. Such a practice would be a fraud upon the people. Prior to the adoption of our constitution, the practice had been to submit the question to the vote of the people. The constitution is silent as to the mode of ascertaining the wishes of the people. The legislature has provided for a vote. This is an honest and fair mode of acting. The people should never be cheated or defrauded into taking stock in a railroad. If the question is fairly submitted

to them, and they, with full knowledge that it is intended to subscribe for stock, impose the tax on themselves, they will have no cause of complaint against any person but themselves.

Having arrived at the conclusion that section six of article ten recognizes the existence of the constitutional power in the legislature to authorize municipal corporations to subscribe for stock in railroad companies, subject to the limitations prescribed, we are next required to determine whether this power carries with it, by necessary implication, the power to adopt such means as may be adequate to accomplish the end proposed.

MARSHALL, C. J., in delivering the unanimous decision of the court, in the case of M'Culloch v. Maryland, 4 Wheat. 316, says, "We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think that the sound construction of the constitution must allow to the national legislature that discretion with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

In the case of Thayer v. Hedges, 23 Ind. 141, this court adopts the rule of construction laid down by MARSHALL, C. J. FRAZER, J., in speaking for the court, says, "To do so, it may resort to any measure which is appropriate, which plainly conduces to that end, and which is not prohibited, and is not inconsistent with the letter or spirit of the constitution."

In support of this rule of construction, we refer to the following authorities: Martin v. Hunter's Lessee, 1 Wheat. 304; Cohens v. Virginia, 6 Wheat. 264; Bank of the U. S. v. Norton, 3 A. K. Marsh. 422; Braynard v. Marshall, 8 Pick. 194; Hempstead v. Reed, 6 Conn. 480; Commonwealth v. Lewis, 6 Binn.

266; *Eubank* v. *Poston*, 5 T. B. Monr. 286; *U. S.* v. *Fisher*, 2 Cranch, 358; *M'Culloch* v. *Maryland*, 4 Wheat. 316; *Woodson* v. *Randolph*, 1 Va. Cas. 128; *Magill* v. *Parsons*, 4 Conn. 317; *Commonwealth* v. *Morrison*, 2 A. K. Marsh. 75; ·*Osborn* v. *U. S. Bank*, 9 Wheat. 738; *Wayman* v. *Southard*, 10 Wheat. 1.

It is conceded that section one of article five and section six of article ten, combined, confer on the General Assembly the power to authorize, by appropriate legislation, municipal corporations to subscribe for stock in railroad companies, on the express condition that the money is paid at the time of such subscription; that counties cannot loan their credit or borrow money for such purpose; that the counties have no means of obtaining money except by taxing the people; and that it would be a fraud upon the tax-payers to obtain the money by indirect, unfair, and illegal modes. Does it not necessarily and unavoidably result from these premises, that the only fair and legitimate mode of obtaining the money for such purpose, is to submit the question to the people; and that the means adopted in the case under consideration were appropriate, plainly conduced to the end, were not prohibited, and are not inconsistent with the letter and spirit of the constitution?

We have heretofore shown that it is a rule of construction that a cotemporary exposition of the constitution, practiced and acquiesced in for a period of years, fixes the construction; and that the court will not shake or control it. We have shown what was the policy of the State, as declared in her legislative acts. We now proceed to show what exposition has been given of the old constitution and the laws passed under it, authorizing counties to take stock in railroad companies, and of the new constitution.

The question was submitted to the voters of Knox county, under the twelfth section of the special charter of the Ohio and Mississippi Railroad Company, whether they were in favor of the county subscribing for stock in such company. The vote was in favor of such subscription. The bonds of the county were issued prior to the adoption of the present

constitution.    The county afterwards refused to pay the inter-
est upon such bonds.    William H. Aspinwall and others, who
were the owners of some of the bonds issued by said county,
commenced an action in the circuit court of the United
States against the commissioners of said county, to recover
the amount of interest due on such bonds.    The plaintiffs
recovered a judgment in the circuit court, and the defendants
appealed to the Supreme Court of the United States, where
the judgment was affirmed.    The Supreme Court held the
law under which such subscription was made to be valid,
and that the action of the board of commissioners was bind-
ing upon the county.    See 21 How. 539.

After the rendition of this judgment, the commissioners
of said county refused to levy a tax to pay such judgment.
The same plaintiffs commenced a proceeding by mandate
against the commissioners of said county in the circuit
court of the United States, to compel them to levy a tax to
raise money to pay said judgment.    A peremptory mandate
was awarded.    The commissioners again appealed to the
Supreme Court of the United States, where the judgment
below was again affirmed.    See 24 How. 376.

The people of Daviess county, by a popular vote under said
twelfth section, decided in favor of taking thirty thousand dol-
lars stock in said railroad.    The vote was taken on the first
Monday of March, 1849.    The commissioners of said county,
on the 10th of September, 1852, in pursuance of said act and
election, subscribed for such stock and issued the bonds of
the county.    The new constitution took effect on the 1st day
of November, 1851.    The commissioners of said county re-
fused to pay the interest on such bonds.    The holders of the
bonds commenced an action in the circuit court of the Uni-
ted States against the commissioners of said county, to re-
cover two instalments of interest on such bonds.    The judges
of the circuit court divided and certified a division of opinion,
and on that the case went to the Supreme Court of the Uni-
ted States.    The vote had been taken under the old constitu-
tion, and the subscription had been made, and the bonds had

been issued, after the new constitution took effect. The question was, whether at the time when the new constitution took effect, there was not such a right to the subscription and bonds vested in the railroad company as could be upheld, notwithstanding the constitutional prohibition against a county subscribing for stock in a railroad company, and issuing bonds therefor, instead of paying for the same at the time when such subscription was made.

The Supreme Court held that the vote in favor of the subscription was valid, but that the subscription and bonds were void for the reason that the sixth section of article ten of our constitution prohibited a county from subscribing for stock in a railroad company unless the money was paid at the time the subscription was made.

We regard this decision as entitled to great weight in the case under consideration, for the reason that it furnishes a cotemporary exposition of the section under discussion, and shows that the prohibition in said section was not against a county subscribing for stock, but against issuing the bonds of the county, instead of paying the money as required by said section. The court held that the power conferred by the charter being upon a county, a public corporation, or civil institution of government, did not constitute such a contract as contemplated by the constitution, which prohibits any state from passing any law "impairing the obligation of a contract." See *Aspinwall* v. *The Commissioners of Daviess Co.* 22 How. 364.

We will next examine the adjudications of this court and see what construction has been placed upon the section under consideration. In *The City of Aurora* v. *West*, 9 Ind. 74, PERKINS, J., in delivering the unanimous opinion of this court, says, "The internal improvement of a state by means of roads and canals has always been a legitimate subject to call into exercise the legislative power of the state. It has been, and still is, thus in Indiana. Under the old constitution, such improvements could be carried on by means of loans, creating a State debt. Under the new, they cannot be carried on by that particular means by the State, but must be paid for

by taxes raised as the works progress. This is an express limitation on the exercise of the power by the State inserted in the constitution. The same limitation is imposed upon the exercise of a like power by the counties of the State. Section six of article ten, by implication, *concedes the power to counties to take stock*, at all events by permission of the legislature, in companies chartered to construct works of internal improvement,—under the new constitution, by making cash payment at the time, under the old, as we have seen, without; and it does not impose any limitation upon the power of cities touching the matter, while it shows that the subject of their taking stock in such companies must have been before the constitutional convention. The provisions in the new constitution, then, on the question under consideration, amount to this : They admit the power of the State to construct works of internal improvement, but forbid her, in her State capacity to create a debt for that purpose. *They grant that the power may be conferred upon counties to take stock in companies chartered to construct such works, but require simultaneous payment.*"

This court, in case of *Dronberger* v. *Reed*, 11 Ind. 420, says, " Can the taking in this case be regarded as having been by the state? Strictly speaking, all private property taken for public use is taken by the state. No other power can take it. It must be taken by the sovereign power in the exercise of the right of eminent domain. The public necessity and convenience have always indicated highways as one of the objects for which the state might take private property. But the state does not always—scarcely ever, indeed—take the property directly herself. She acts through agents. It is, nevertheless, the state that takes by her agents. But after the policy was adopted, of permitting corporations, such as canal, railroad, and turnpike companies, to construct certain highways, or *quasi* highways, at their own expense and for their own profit, instead of the state, and to take private property for that purpose, it sometimes happened that certain of those companies became unable to pay for the property so taken; and

to obviate this difficulty, to remedy this evil, the clause in the new constitution was framed in the language we have quoted. It was not very happily chosen. It is certainly not very perspicuous, and does not evince a very clear idea of the subject to have existed in the mind of the author of the section. But we know, historically, that it was aimed at the companies and the evil we have stated. This fact should have influence in its construction."

The foregoing cases have been referred to and approved by this court, in *The Evansville, &c., R. R.* v. *City of Evansville,* 15 Ind. 395; *The Board of Commissioners of Bartholomew Co.* v. *Bright,* 18 Ind. 93; and *The City of Aurora* v. *West,* 22 Ind. 88.

This court, in the case of *Thompson* v. *The City of Peru,* 29 Ind. 305, refers to and fully approves of the opinion and reasoning of PERKINS, J., in *The City of Aurora* v. *West,* 9 Ind. 74. GREGORY, C. J., in speaking for the entire court, says, "It is insisted that this section is within the prohibition contained in sections five and six of article ten of the constitution. The former section prohibits the State from contracting a debt to aid in the work of internal improvement; and the latter prohibits counties from subscribing for stock in any incorporated company, unless the same be paid for at the time of such subscription."

The section of the constitution under consideration is not self-executing. It requires the affirmative action of the legislature, authorizing the boards of commissioners to subscribe for stock. This doctrine is very fully discussed and decided in *Harney* v. *The Indianapolis, &c., R. R. Co.,* 32 Ind. 244. FRAZER, C. J., in delivering the unanimous decision of the court, says: "The counties are corporations created for the purpose of convenient local municipal government, and possess only such powers as are conferred upon them by law. They act by a board of commissioners whose authority is defined by statute. One of the powers conferred is, to collect taxes levied upon the people and property within the county. In the disposition of the

money thus collected into its general treasury, the board has not unlimited discretionary choice as to the objects upon which it shall be expended. It can only be applied to certain specified objects, and the building of railroads is not one of these objects, or necessary to carry into effect any of the purposes for which such corporations were created. The statutes defining the powers, both corporate and judicial, of boards of county commissioners, enumerate the powers given with care; so that there is little room for doubt as to the extent of those powers. If the authority attempted to be exercised in this instance had been conferred, the statute giving it would not have escaped the attention of the learned counsel representing the appellees, whose carefully prepared printed argument so well attests the skill and industry to which the important interests of his clients have been committed. But no such statute is brought to our attention. While it is undoubtedly true, that municipal corporations, in common with all other instrumentalities of government, are established for the public good, it is not true that they are ordinarily left at liberty to exercise an unlimited discretion in accomplishing that object, or that they are possessed of that discretion unless there is an express limitation imposed. The power to collect money by the imposition of taxes is a high sovereign power, and it is not to be assumed that the legislature has delegated that power to municipalities for discretionary purposes where it has named the purposes for which the money must or may be expended. Such enumeration of objects of expenditure would, according to all authority, exclude objects not enumerated or implied. It need not be controverted that the legislature could clothe counties with power to make such donations as was here attempted. That is not the question before us. Has it been done? Unless the statute book shows affirmatively that it has been done expressly or by fair implication, the conclusion is irresistible that the action of the board of Montgomery county was without authority of law, and therefore void. There is no such statute."

The Lafayette, Muncie, and Bloomington R. R. Co. and Another *v.* Geiger.

The Supreme Court of the United States, in *Thomson* v. *Lee County*, 3 Wall. 327, say: "A county or other municipal corporation has no inherent right of legislation, and cannot subscribe for stock in a public improvement, unless authorized to do so by the legislature. Such a corporation acts wholly under a delegated authority, and can exercise no power which is not in express terms or by fair implication conferred upon it. But the legislature of a state, unless restrained by the organic law, has the right to authorize a muncipal corporation to take stock in a railroad or other work of internal improvement, to borrow money to pay for it, and to levy a tax to repay the loan. And this authority can be conferred in such a manner, that the object can be attained, either with or without the sanction of the popular vote."

Section six of article ten of our State constitution expressly prohibits a county from borrowing money to pay for stock subscribed for by such county; consequently, so much of the above opinion as declares the right of a county to borrow money will not apply in this State.

The fourteenth section of the act in question provides, that " said board of commissioners may, after the assessment herein provided for or any part thereof shall have been collected, take stock in such railroad company from time to time, in the name of the proper county or township, as the case may be, and pay therefor when the same is taken, out of the money so collected as aforesaid," &c. Now it is plain from the above quoted provision that this act was not intended to bind a county for a dollar until the money shall be in the treasury from the special tax levied to pay for the stock, and no subscription is authorized to be made until that time. This complies with the plain and undoubted requirements of our constitution. When the money is in the treasury, there is no limitation or restriction contained in the sixth section.

We therefore hold that the General Assembly possessed the power under the constitution to authorize counties to subscribe for stock in a railroad company, on the express condition that the stock is paid for in money at the time

when the subscription is made; and that the means provided in the said act to raise the money with which to pay for said stock were appropriate, plainly conduced to the end proposed, were not prohibited by the constitution, and were not inconsistent with the letter or spirit of the constitution.

The case under consideration involves the right of a county to make subscriptions to a railroad. We only decide the real question involved in the case. There are other causes pending in this court involving the right of counties to make donations to railroad companies, and of townships to subscribe for stock and to make donations to railroad companies. As to these cases, we withhold the expression of any opinion.

It is next insisted by the appellees that the act in question violates the twenty-fifth section of article one of our State constitution. This section reads as follows: "No law shall be passed, the taking effect of which 'shall be made to depend upon any authority, except as provided in this constitution."

It is claimed on the authority of the above section, first, that the act in question is no *law;* that it is not an expression of the legislative will *as law*, but only a proposition to make law; second, that if it be law and an expression of the legislative will, still its taking effect is made to depend, not on the will of the legislature, but on the will of the people.

The point relied upon is, that the vote of the people gives vitality and validity to the act; in other words, that it does not become a law until it has been ratified by a vote of the people. The precise question was raised in the case of *The C. W. & Z. Railroad* v. *Commissioners of Clinton County*, 1 Ohio St. 77. The question is discussed with great clearness, force, and ability by RANNEY, J., and as we fully concur in the views expressed by him, we will quote from his opinion. That able and learned judge, speaking for the court, says: "That the General Assembly cannot surrender any portion of the legislative authority with which it is invested, or authorize its exercise by any other person or body, is a proposition too clear for argument, and is denied by no one.

This inability arises no less from the general principle applicable to every delegated power requiring knowledge, discretion, and rectitude, in its exercise, than from the constitution itself. The people, in whom it resided, have voluntarily relinquished its exercise, and have positively ordained that it shall be vested in the General Assembly. It can only be reclaimed by them, by an amendment or abolition of the constitution, for which they alone are competent. To allow the General Assembly to cast it back upon them, would be to subvert the constitution and change its distribution of powers, without their action or consent. The checks, balances, and safegards of that instrument are intended no less for the protection and safety of the minority than the majority; hence, while it continues in force, every citizen has a right to demand that his civil conduct shall only be regulated by the associated wisdom, intelligence, and integrity of the whole representation of the State.

"But while this is so plain as to be admitted, we think it equally undeniable, that the complete exercise of legislative power by the General Assembly does not necessarily require the act to so apply its provisions to the subject matter as to compel their employment without the intervening assent of other persons, or to prevent their taking effect, only upon the performance of conditions expressed in the law.

"Indeed, the whole body of our legislation, as well as that of every other state, is divided between laws which imperatively command or prohibit the performance of acts, and those which only authorize or permit them. Time and space would both fail me, to refer in detail to all of those of the latter description. A few, however, will serve to illustrate the whole. The county commissioners in each county are authorized, but not required, to erect public buildings, and to erect and establish poor houses, in their respective counties, and to levy taxes for these purposes. In these cases, with many others that might be mentioned, the discretion is vested in the county commissioners. * * *

"But because such discretion is given, are these, and all

similar enactments, to be deemed imperfect and nugatory? It would take a bold man to affirm it. In what does this discretion consist? Certainly not in fixing the terms and conditions upon which the act may be performed, or the obligations thereupon attaching. These are all irrevocably prescribed by the legislature, and whenever called into operation, conclusively govern every step taken. The law is therefore perfect, final, and decisive, in all its parts, and the direction given only relates to its execution. It may be employed or not employed; if employed it rules throughout; if not employed it still remains the law, ready to be applied, whenever the preliminary condition is performed. The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.

"The act under consideration is mandatory in some of its provisions, and leaves a discretion in others. It commands the vote to be taken, and if the subscription is made, it imperatively directs all the subsequent proceedings. But it submits to the discretion of the voters of Clinton county, who are chiefly interested and to bear the burden, if assumed, whether the subscription shall be made, and the law thus fully executed. But this power of deciding upon its execution, so far from being contradictory to or inconsistent with the act, is the condition prescribed by the law making power itself, upon which alone it is permitted to have effect. It is not the vote that makes, alters, or even approves the law, but, as well remarked by one of the counsel, it is the law that makes the vote, and prescribes everything to be done consequent upon it."

The above decision draws a distinction between the taking effect of a law and its execution or enforcement. The same distinction has been made by this court in several cases. In the case of *The Board of Commissioners* v. *Spitler*, 13 Ind.

235, this court say: "It is insisted that the power to organize new counties has never been exercised by direct legislation, and cannot be delegated. The position thus assumed is not, in our opinion, well taken. The act of March, 1857, is a general law of uniform operation, to be executed through the agency of the board of commissioners. And it seems to us, that the power thus conferred, so far as it relates to their duties under the act, is purely ministerial, and not legislative. Indeed, the constitution itself declares, that 'the General Assembly may confer upon the boards doing county business in the several counties, powers of a local, administrative character.' Art. 6, sec. 10. Under this provision, the legislature seems to be plainly authorized to confer the power embraced in the act before us. In cases like the present, the taking effect of the law is not the result of any action on the part of the commissioners; nor do they decide whether the act is or is not in force, but simply whether it applies to the case made by the petition which the act prescribes. This is evidently not the exercise of delegated legislative power, but merely the application of the provisions of a general law to a given case, local in its character."

This court, in the case of *Thompson* v. *City of Peru*, 29 Ind. 305, say, "The twenty-fifth section of the bill of rights provides, that 'no law shall be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this constitution.' The right of petition, as a condition precedent to the exercise of this power by the common council, if it existed as to subscriptions of stock, would not render this section void under this provision. *The law is in force.* The petition is only *necessary to call into action the power conferred* on cities."

Judge COOLEY, in his very learned and valuable work on Constitutional Limitations, in discussing the question under consideration, says: "One of the settled maxims in constitutional law is that the power conferred upon the legislature to make laws, cannot be delegated by that department to any other body or authority. Where the sovereign power of the

state has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the constitution itself is changed. * * · * But it is not always essential that a legislative act should be a completed statute which must, in any event, take effect as law, at the time it leaves the hands of the legislative department. A statute may be *conditional*, and its taking effect may be made to depend upon some subsequent event. Affirmative legislation may, in some cases, be adopted, of which the parties interested are at liberty to avail themselves or not, at their option. A private act of incorporation cannot be forced upon the corporators; they may refuse the franchise if they so choose. · In these cases the legislative act is regarded as complete when it has passed through the constitutional formalities necessary to perfected legislation, notwithstanding its actually going into operation as law. may depend upon its subsequent acceptance. We have elsewhere spoken of municipal corporations, and of the powers of legislation which may be, and commonly are, bestowed upon them, and the bestowal of which is not to be considered as trenching upon the maxim that legislative power is not to be delegated, since that maxim is to be understood in the light of the immemorial practice of this country and of England, which has always recognized the propriety of vesting in the municipal organizations certain powers of local regulation, in respect to which the parties immediately interested may fairly be supposed more competent to judge of their needs than central authority. * * *

"For the like reasons, the question whether a county or township shall be divided, and a new one formed, or two townships or school districts formerly one be re-united, or a county seat located at a particular place, or after its location removed elsewhere, or the municipality contract particular debts, or engage in works of local improvement, is always a question which may, with propriety, be referred to the voters of the municipality for decision."

The learned judge refers to sixty-one decisions made by the

federal and state courts, in support of the last proposition stated above. See Cooley Const. Lim. 116, 119, and authorities there cited.

If there is no well founded distinction between a law being in force and its execution, then a large number of the laws of this State are not in force. Prior to the adoption of the present constitution, special charters were passed for cities, towns, railroads, canals, manufacturing and trading companies. After the adoption of the new constitution general laws were passed on all these subjects, and there is a provision that any incorporated city, town, or other company acting under a special charter may abandon its rights under the special charter, and may organize under the general laws. If the position assumed by the appellee be correct, these general laws are not in force until those acting under special charters avail themselves of the privilege granted, and if they never accept the provision made for them, then the laws will never be in force. We cannot endorse such a construction. If the execution of a law cannot be made to depend upon the action of the people, then another large class of our legislation will be stricken down. Soon after the adoption of our present constitution, a law was passed authorizing a change of the county seat of Clay county. This law was correctly held by this court to be local and special, and was in conflict with sections twenty-two and twenty-three of article four of the constitution, because a general law could be made on that subject. See *Thomas* v. *Commissioners of Clay Co.*, 5 Ind. 4. The General Assembly then passed a general law providing for the change of county seats. The General Assembly has also passed a general law providing for the creation of new counties. The boards of commissioners possess no jurisdiction to act under either of these laws, until the matter is presented to them by petition. There has been but one new county created under the general law, and very few applications have been made for the creation of new counties. There have been very few applications made for changes of county seats, and only three.

Vol. XXXIV.—15

or four county seats have been changed. If the position assumed is correct, these laws have not been in force except in those counties where the exercise of the power has been called into existence by the right of petition. The boards of commissioners are authorized, upon petition, to establish new roads, and to change and vacate existing roads. We might refer to many other illustrations, but time and space forbid. In all of the above cases, the taking effect of the laws was not made to depend upon the action of the people, but they were in force as soon as they were passed, under the forms prescribed by the constitution, but the execution of them depended upon whether they were called into exercise in the manner prescribed. We have general laws defining felonies and misdemeanors; will it be maintained that these laws are not in force in every county in the State, because their provisions are not violated, and the courts are not called upon to enforce them?

It is maintained with great earnestness, that the act under consideration was not in force until the vote of the people of Tippecanoe county put it in force. If its being in force depends upon the vote of the people, then it never has been and never can be in force. By what authority was the question submitted to the vote of the people? It was under and by virtue of this act. If it was not in force by virtue of having been passed by the legislature and approved by the governor, then the commissioners of said county possessed no power or authority to submit the question to the vote of the people, and the vote would be nugatory and void. Surely it will not be maintained that a nugatory and void vote can have the force and effect of putting a law in force. Such a principle can be maintained neither on principle nor by authority. That the vote of the people can have no such effect, is settled by the decision of the Supreme Court of the United States in *Aspinwall* v. *Commissioners of Daviess County*, 22 How. 364.

The case mainly relied upon by the appellees to support their position is the case of *Maize* v. *The State*, 4 Ind. 342.

The Maize case was simply this: He was indicted for retailing without license, which he admitted. The act of March 4th, 1853, to regulate retailing, provided that no person should retail spiritous liquors, except for certain named purposes, without the consent of a majority of the legal voters of the proper township, who might cast their vote for license at the April election. No license could be granted to retail in a township where such consent was not given. Thus it was decided that the license law, if it should operate uniformly over the State, was made to depend upon the will of the majority of the voters in every township as expressed at the election, and if that majority chose to remain silent upon the subject or to vote against it in any one township, no license therein could be granted. In short, the construction given by the court was that the act was intended to be a license law or a prohibitory law in the different townships, whichever the voters of each township chose to make it. It was therefore held that that part of the act which required the vote was void, because it made the taking effect of the law depend upon an authority unknown to the constitution, and because the law, if sustained, would be local in its operation where a general law on that subject could be made. The conviction was sustained, however, because he had retailed without license.

The liquor law of March 4th, 1853, was held to be unconstitutional on two grounds, first, because it conflicted with section twenty-five of the bill of rights, which declares, that "no law shall be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this constitution;" second, because it conflicted with sections twenty-two and twenty-three of article four, which prohibit local and special laws. The law under consideration cannot be affected by the constitutional prohibitions against local or special laws. The sixth section of article ten of the constitution makes the subscription of stock depend upon the separate and independent action of each county. While the law may be general and uniform, the exercise of the

power granted must be local in its operation. Section ten of article six of our constitution provides, that "the General Assembly may confer upon the boards doing county business in the several counties, powers of a local, administrative character." Under this section, the General Assembly may enact a general law conferring upon boards doing county business powers of a local, administrative character, and their acts will not be void because they are local. Local laws may be passed for local purposes.

The principle involved in the case under consideration is clearly distinguishable from that decided in the Maize case. In that case, the law could have been made general, while under the operation of the voting clause it might be prohibitory in one township, and in an adjoining township it would be lawful to retail intoxicating liquors; in one township a citizen was liable to be indicted and punished for an offense, while another citizen in an adjoining township for doing the same thing was guilty of no offense.

The railroad law is general and in force in every part of the State, open to any county or township to avail itself of its privileges upon complying with its terms. It has no double aspect according to the views or consent of the voters in the several townships. There is no essential difference between the vote taken in the mode required and a petition signed by the voters for the county commissioners to appropriate the aid asked. · The law requires, as preliminary, that there shall be a duly organized railroad company, that the road to be aided shall run in or through the county or township, that a petition of one hundred freeholders of the former or twenty-five of the latter shall ask the amount desired to aid the road, and notices must be published stating how much is to be voted for; so that each voter when he deposits his ticket "for the railroad appropriation" or "against the railroad appropriation," in effect petitions the county commissioners to grant it or remonstrates against it, according as his ticket reads. The mode of ascertaining the wishes of the voters upon the subject is, for the sake of convenience

and more especially for certainty, similar to an election for public officers, and was adopted to afford a public opportunity to each county or towship to determine, not whether the law shall be in force, but whether the people desire to avail themselves of its privileges.

It is also claimed by the appellee that the act in question violates section one of article ten of our constitution, which provides, that "the General Assembly shall provide by law for a uniform and equal rate of assessment and taxation," &c.

This section has received a construction by this court, which shows that it is not obnoxious to the objection urged.

This court, in *Bright* v. *McCullough,* 27 Ind. 223, say: Section one of article ten "does not require that the rate of assessment shall be uniform and equal for all purposes throughout the State; and we think its meaning clearly is, that the rate of assessment and taxation must be uniform and equal throughout the locality in which the tax is levied. If the levy is for State purposes, then the rate must be equal and uniform in all parts of the State; and if the levy be for county purposes, the rate must be uniform and equal throughout the county in which the levy is made; and so in townships, where the levy is for township or road purposes. It was simply intended that the uniformity and equality of rate should be co-extensive with the territory to which the tax applies."

It was conceded in the argument that the above construction of section one of article ten was correct, but it was maintained that as the railroad extended from Muncie, in Delaware county, through the counties of Madison, Tipton, Clinton, Tippecanoe, and Benton, in this State, it was necessary that each and all of the counties must vote for an appropriation and assess the same amount of tax in each county, to make it uniform and equal. This position is wholly untenable. We have already shown that section six of article ten of our constitution has legalized the subscription of stock by counties, and made it depend upon the separate and independent action of each county, uninfluenced and uncontrolled by the

action of any other county. If the tax assessed is equal and uniform in the county where assessed, it will be in strict accordance with the requirements of the constitution.

We therefore hold that the law in question is not in conflict with any provision of our constitution.

But it is urged that the proceedings of the Board of Commissioners of Tippecanoe county were irregular and illegal. The objections were presented in argument in detail, but when genalized they amount to three. The first is, that the commissioners changed the places of voting of Fairfield township two days before the vote was taken for or against the appropriation to the railroad.

The second is, that the inspectors in two of the townships made no return of the votes taken therein.

The third is, that the question submitted to the voters of the county was for or against a subscription of stock by the county in said railroad, and thereby excluded from the voters the question of donating the money to aid in the construction of the said railroad.

Section four of the act under consideration reads as follows:

"Sec. 4. The polls shall be opened at the several voting places in the county, or township, as the case may be, by the proper judges and inspectors of election, on the day fixed by said commissioners, and the boards shall be organized and poll books and tally sheets shall be kept, and the whole voting, and taking and certifying of votes, shall be conducted as nearly as may be in the manner provided by law for conducting the voting and certifying the votes at the general election for State and county officers."

Section four of the election law of May 13th, 1869, provides, that "the board of county commissioners of the proper county, may designate one or more places of holding elections in any township, or form precincts of two or more townships, when public convenience require it." Acts of 1869, p. 59.

Section fifteen of the act to provide for contesting elections provides as follows:

"No irregularity or malconduct of any member or officer of a board of judges or canvassers, shall set aside the election of any person, unless such irregularity or malconduct was such as to cause the contestee to be declared elected when he had not received the highest number of legal votes." 1 G. & H. 318.

There is no allegation of fraud; it is not alleged that any legal voter was prevented from voting, or that any illegal voter was permitted to vote. It is stated in the complaint, admitted in the briefs, and was conceded in the oral argument, that if all the votes in the two townships from which no returns were made were counted against the appropriation, there would be a clear majority of all the votes cast in favor of the appropriation.

It was said by this court, at the present term, in case of *Gass* v. *The State, post*, 425, that "it is settled by authority that statutes regulating the mere mode of conducting elections are directory, and that any departure from the prescribed mode will not vitiate an election, if the irregularity does not deprive any legal voter of his vote, or admit a disqualified voter to vote, or cast uncertainty on the result, and has not been occasioned by the agency of the party seeking to derive a benefit from it." Cooley Const. Lim. 617, 618, and authorities there cited.

The following case is much in point: The question submitted to the voters was the removal of a county seat, and it was claimed that there had been gross irregularities in the proceedings of the judges of the election, some of whom were personally interested. The court say: "But the burden of proof is on the contestant to show that there were irregularities, *and that they affected the result.*" In support of this conclusion numerous authorities are cited. Again, the court say: "The facts stated in the notice being admitted by the demurrer, the question presented is, whether these errors or irregularities render void the election in said towns. It will be observed that fraud is not charged, nor is it alleged that any illegal votes were polled, or that any legal votes were excluded. The law requires the judges of elec-

tion to take the prescribed oath and keep register poll lists, and forbids a candidate at such election to act as one of the judges, but it is in no place provided that a failure to comply with the law in any of these respects shall render void the election. The public good demands that the will of the people as expressed at the ballot-box should not be lightly disturbed. There is hardly an election held in any county in which some irregularities do not occur, and to declare every such election void would work a manifest hardship and injustice. If the votes of the citizens are freely and fairly deposited at the time and place designated by law, the intent and design of the election are accomplished. It is the will of the electors thus expressed that gives the right to the office, or determines the question submitted, and the failure of the officers to perform a mere ministerial duty in relation to the election cannot invalidate it, if the electors had actual notice and there was no mistake or surprise." *Taylor* v. *Taylor*, 10 Minn. 107.

Where the question of aiding a railroad by a county subscription was submitted to the voters, and the sheriff was required by statute to have the polls opened to receive the votes, but failed to do it at one precinct, wherefore it was claimed the voting was void, the court, after a careful consideration of the point, decided : "The failure of the sheriff to have the polls opened at one precinct does not invalidate. To have that effect it must appear also by the facts that such failure did or might have affected the general result of the contest." *L. & N. R. R. Co.* v. *County Court*, 1 Sneed, 637.

There is no doubt that the board of commissioners possessed the power to designate the places of holding the election. The law does not prescribe the time when it shall be done, nor does it require any notice to be given when there is a change of places of holding the election. If the votes given in the two townships from which no returns were made would have changed the result, the consequences would have been very different. The law regards the substance, and not mere forms. It is the duty of the courts to

carry out the will of the people as expressed at the ballot box, where the only objections urged are mere irregularities. On the other hand, it is the duty of the court to set aside an election whenever and wherever the will of the people has been defeated by unfairness and fraud. In the case under consideration, there was no unfairness or fraud. The vote polled was a large one. The majority of the votes cast was about six hundred. The votes cast for the appropriation did not fall much short of a majority of all the legal votes in the county. Under such circumstances, we cannot hold the election void for mere irregularities that in no manner affected the result. In doing so we would perpetrate a great wrong.

The third and last objection has given us more trouble. When the commissioners ordered a vote to be taken, they adopted a resolution to the effect that if the vote of the county was in favor of an appropriation, they would subscribe for stock in said railroad, for and on behalf of the county. This resolution was published in the election notice. The vote, however, was taken according to the law, "For the Railroad Appropriation," and "Against the Railroad Appropriation." The fourteenth section of the act provides, that after the vote and after a part of the tax is collected, the board of commissioners may either take stock in, or donate money to, the company. The members composing this court have been unable to agree upon this question. Downey, J., is of the opinion that the board of commissioners possessed no power to exercise the discretion vested in them until after the vote, and after a part of the tax was collected, and the giving of notice to the voters that a vote on subscription of stock only would be taken may have prevented persons from attending the election and voting, who would have done so if they had supposed that the money, when collected, would be donated to the said railroad company. While concurring with the opinion of the court upon the other questions decided, he feels constrained to dissent from the judgment of the court, for the cause aforesaid.

Pettit, C. J., and Worden, J., are of the opinion that the

resolution of the board declaring their purpose to subscribe for stock had no legal effect, and did not influence the action of the voters, or in any manner change the result of the vote. They regard the resolution as merely advisory, and that it was adopted for the sole purpose of obtaining the wishes and preferences of the voters and tax payers, to guide the commissioners in the exercise of the discretion vested in them, when the proper time should arrive to make the decision. BUSKIRK, J., is of the opinion, that under the sixth section of article ten of our constitution, the legislature possessed no constitutional power to authorize the board of commissioners of a county to levy a tax, and, when collected, donate the money to a railroad company, and that, therefore, the commissioners submitted to the voters of the county the only proposition that they had a right to vote on.

The judgment is reversed, with costs, and the cause is remanded, with directions to the court below to sustain the demurrer to the complaint, and dissolve the injunction, and for further proceedings in accordance with this opinion.

*Coffroth & Ward, J. A. Stein, W. C. Wilson, R. P. De Hart, Chase & Wilstach, J. Hughes,* and *J. E. McDonald,* for appellants.

*Jones, Miller & Stallard, Hendricks, Hord & Hendricks, R. P. Davidson,* and *Wallace & Hiett,* for appellee.

